OSCN Found Document:WHITE STAR PETROLEUM v. MUFG UNION BANK

 

 
 

 
 WHITE STAR PETROLEUM v. MUFG UNION BANK
2020 OK 89
Case Number: 118746
Decided: 10/20/2020
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2020 OK 89, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

WHITE STAR PETROLEUM, LLC, Appellant,
v.
MUFG UNION BANK, N.A., Appellee.

CERTIFIED QUESTIONS FROM THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

Â¶0 The United States Bankruptcy Court for the Western District of Oklahoma certified to this Court two questions of state law pursuant to the Revised Uniform Certification of Questions of Law Act, 20 O.S. Â§Â§ 1601-1611.

CERTIFIED QUESTIONS ANSWERED

Lewis Lenaire, Craig Regens, Graydon D. Luthey, Jr., GableGotwals, Oklahoma City, Oklahoma, for Appellant.

Neal Tomlins, Tomlins Law, PLLC, Tulsa, Oklahoma, for Appellee MUFG Union Bank, N.A.

Michael Bickford, Fuller, Tubb & Bickford, PLLC, Oklahoma City, Oklahoma, for Appellee Shebester-Bechtel, Inc.

J. Clay Christensen, Jonathan M. Miles, and Brock Z. Pittman, Christensen Law Group, PLLC, Oklahoma City, Oklahoma, for Appellees Casing Crews, Inc., Casing Equipment Supply, LLC, Monster Services, LLC, and Superior Oilfield Consulting, LLC.

Mark A. Craige and Alexander Sokolosky, Crowe & Dunlevy, Tulsa, Oklahoma, for Appellees Latshaw Drilling Company, LLC, and Mustang Heavy Haul, LLC.

Bradley Davenport, Doerner, Saunders, Daniel & Anderson, LLP, Oklahoma City, Oklahoma, Kenneth Green and James B. Hamm, Snow, Spence, Green, LLP, Hockley, Texas, for Appellee Baker Hughes Oilfield Operations, LLC.

Bradley Davenport, Doerner, Saunders, Daniel & Anderson, LLP, Oklahoma City, Oklahoma, William R. Sudela, Crady, Jewett, McCulley & Houren, LLP, Houston, Texas, for Appellee MS Directional, LLC.

Clayton D. Ketter, Phillips Murrah, P.C., Oklahoma City, Oklahoma, for Appellees Ag & Oil Field, LLC, B.O.P. Ram Block and Iron Rentals, Inc., Journey Oilfield Equipment, LLC, Road Runner Trucking, LLC, Simmons Machine Work, Inc., and Western Workstrings, LLC.

Samuel Scott Ory, Frederic Dorwart, Lawyers, PLLC, Tulsa, Oklahoma, for Appellee Cactus Drilling Company, LLC.

Michael Rubenstein and Leif Swedlow, Rubenstein & Pitts, PLLC, Edmond, Oklahoma, for Appellee Jackson Electrical Construction, LLC.

James Vogt, Reynolds, Ridings, Vogt & McCart, PLLC, Oklahoma City, Oklahoma, for Appellee RK&R Dozer Service, LLC.

Phillip B. Wilson, Franden, Farris, Quillin, Goodnight & Roberts, Tulsa, Oklahoma, for Appellee Day County Services, Inc.

Rowe, J:

Â¶1 The United States Bankruptcy Court for the Western District of Oklahoma certified two questions of state law to this Court under the Revised Uniform Certification of Questions of Law Act, 20 O.S. Â§Â§ 1601-1611. The questions certified are:

1. Are the "trust funds" created by Title 42 O.S. Â§ 144.2, entitled "Creation and Appropriation of Trust Funds for Payment of Lienable Claims," limited to obligations due non-operator joint working interest owners, or do such funds include payments due holders of mechanic's and materialmen's liens arising under and perfected by Title 42 O.S. Â§ 144?

2. Does the Oil and Gas Owners' Lien Act of 2010, Title 52 O.S. Â§ 549.1 et seq., grant an operator and non-operator working interest owners a lien in proceeds from purchasers of oil and gas which is prior and superior to any claim of the holder of a mechanic's and materialmen's lien asserted under Title 42 O.S. Â§ 144?

CERTIFIED FACTS AND PROCEDURAL HISTORY

Â¶2 White Star Petroleum, LLC, along with its wholly-owned subsidiary, White Star Petroleum II, LLC (collectively "White Star") were engaged in the business of exploring, acquiring, drilling, and producing oil and natural gas, either as an operator or non-operating working interest owner of various leaseholds across Oklahoma. In instances where White Star's leaseholds had more than one working interest owner, operations of the leaseholds were governed either by consensual joint operating agreements, or in the absence of such agreements, by forced pooling orders entered by the Oklahoma Corporation Commission. In either circumstance, the operator of the leasehold, whether White Star or another entity, was tasked with drilling and producing minerals on behalf of itself and any other interest owners, as well as distributing profits to the interest owners in proportion to their share.

Â¶3 Incident to managing the leaseholds, White Star and the operators with which it contracted were required to enter into drilling and reworking contracts with various third-party vendors and service providers. Pursuant to the joint operating agreements and forced pooling orders, the costs incurred under these contracts were to be divided among the working interest owners in proportion to their share. Typically, the operator would bear these costs initially and then receive reimbursements, known as Joint-Interest Billing Payments ("JIBs"), from the other interest owners.

Â¶4 On May 24, 2019, several of White Star's unpaid vendors filed an involuntary bankruptcy petition against White Star in the United States Bankruptcy Court for the Western District Oklahoma. On May 28, 2019, White Star and its affiliates filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. On June 2, 2019, the bankruptcy case initiated by White Star in Delaware was transferred to the Western District of Oklahoma. On July 3, 2019, the Bankruptcy Court for the Western District of Oklahoma ("the Bankruptcy Court") consolidated the voluntary and involuntary petitions.

Â¶5 Bankruptcy filings indicated that as of December 2018, White Star had approximately $347 million in total funded debt, including $274 million owed to secured lenders. Among its assets were 883 gross productive wells, 590 of which were being operated. On September 30, 2019, the Bankruptcy Court approved the sale of essentially all of White Star's assets to Contango Oil & Gas Company for $132.5 million.

Â¶6 During the bankruptcy proceedings, 78 unpaid vendors filed adversary proceedings seeking adjudication of statutory lien claims under 42 O.S. Â§ 144 against White Star's interests in various wells and establishment of trust fund claims under 42 O.S. Â§ 144.2. These proceedings were stayed when, on October 31, 2019, White Star initiated two adversary proceedings of its own. The first sought adjudication of the priority, validity, and value of approximately 2,000 mechanic's and materialman's liens ("M&M liens") asserted by the 78 unpaid vendors over various interests held by White Star. The second sought an order of the Bankruptcy Court directing several first purchasers of oil and gas to turn over to White Star approximately 2 million dollars, which were being held in suspense after the purchasers received statutory lien notices from the M&M lien claimants. The Bankruptcy Court certified the questions to this Court to aid in the resolution of these two adversary proceedings.

REQUIREMENTS FOR ANSWERING CERTIFIED QUESTIONS

Â¶7 This Court is vested with discretionary authority to review questions of law certified to it by a court of the United States, so long as (1) the answer would be dispositive of an issue in pending litigation in the certifying court; and (2) there is no established and controlling law on the subject matter. 20 O.S. Â§ 1602; Odom v. Penske Truck Leasing Co., 2018 OK 23, Â¶7, 415 P.3d 521. This Court may also reformulate questions certified to it. 20 O.S. Â§ 1602.1; Siloam Springs Hotel, LLC v. Century Surety Company, 2017 OK 14, Â¶ 15, 392 P.3d 262. In reviewing certified questions, we are obligated to consider only those facts enumerated in the certification order, and our examination is confined to resolving legal issues. Government Employees Ins. Co. v. Quine, 2011 OK 88, Â¶14, 264 P.3d 1245, 1249.

DISCUSSION

Â¶8 We find that answering both questions would be dispositive of issues pending in the underlying bankruptcy proceedings and that there is presently no controlling law on the subject matter of either question. Both questions present issues of statutory interpretation. Our primary goal when construing a statute is to ascertain and follow the intent of the Legislature. City of Tulsa v. State ex rel. Public Employees Relations Bd., 1998 OK 92, Â¶14, 967 P.2d 1214. Legislative intent is determined by looking at the whole legislative act in light of its general purpose and object. Id. If a statute is plain and unambiguous and its meaning is clear, the statute will be accorded the meaning expressed in its language. TRW/Reda Pump v. Brewington, 1992 OK 31, Â¶5, 829 P.2d 15, 20. If doubt as to the statute's meaning exists, it can be resolved by looking at legislative history. Lekan v. P&L Fire Protection Co., 1980 OK 56, Â¶6, 609 P.2d 1289, 1292. Where a statute is ambiguous or its meaning unclear, it will be accorded a reasonable construction that avoids absurd consequences. TRW/Reda Pump, 1992 OK 31, Â¶5, 829 P.2d at 20.

I. Title 42, Section 144.2 does not limit the types of revenue which must be held in trust for payment of lienable claims.

Â¶9 The first question, as presented in the certification order, asks:

Are the "trust funds" created by Title 42 O.S. Â§ 144.2, entitled "Creation and Appropriation of Trust Funds for Payment of Lienable Claims," limited to obligations due non-operator joint working interest owners, or do such funds include payments due holders of mechanic's and materialmen's liens arising under and perfected by Title 42 O.S. Â§ 144?

Â¶10 As presently stated, the question appears to ask whether the trust funds held pursuant to 42 O.S. Â§ 144.2 are designated for both non-operator working interest owners and M&M lien claimants. However, based on the facts in the certification order and positions of the parties, which will be discussed more thoroughly below, there does not seem to be any dispute as to who the funds are held for; they are held for M&M lien claimants. Rather, the real dispute among the parties relates to what forms of revenue must be held in trust for payment to lienholders. More specifically, do the statutory trusts apply only to JIBs, which are made by non-operator working interest owners and meant to compensate lienholders for their work, or do they apply to other forms of revenue, such as the funds held in suspense by the first purchasers or the funds from the Contango sale, up to the amount secured by the lien? In order to clarify the issue presented for resolution, we have reformulated the first question as follows:

Whether the funds held in trust pursuant to 42 O.S. Â§ 144.2 for payment of lienable claims created by 42 O.S. Â§ 144 are limited to joint-interest billing payments received by operators for services rendered by the lienholders?

Â¶11 As to this reformulated question, we answer in the negative. Nothing in the text or history of 42 O.S. Â§ 144.2 limits the types of revenue which should be held in trust for payment of lienable claims.

Â¶12 Title 42, Section 144.2 provides, in relevant part:

A. Except as provided by subsection D of this section, the amount payable under any oil and gas well drilling contract, reworking contract, operating agreement, or monies payable as a condition of participation in the drilling of an oil and gas well under the terms of a pooling order issued by the Oklahoma Corporation Commission shall, upon receipt by any oil and gas well operator, contractor or subcontractor, be held by such operator as trust funds for the payment of all lienable claims due and owing by such operator, contractor or subcontractor by reason of such drilling contract, reworking contract, operating agreement, or force pooling order.

[...]

Â¶13 White Star contends that the language of 42 O.S. Â§ 144.2 is concerned exclusively with the obligations that operators incur with third-party vendors pursuant to drilling and reworking contracts. White Star further reasons that because the scope of obligations covered by Â§ 144.2(A) is limited to those amounts due to vendors under drilling and reworking contracts, the only funds which must be held in trust to satisfy these obligations are JIBs, which are traditionally used to satisfy these debts. White Star presents a number of arguments based in the text of the statute and industry practice to support this interpretation.

Â¶14 White Star first claims that the "upon receipt" language in Â§ 144.2(A) evidences an intent on behalf of the Legislature to limit statutory trust obligations to certain sources of funds, specifically those received by the operator to satisfy obligations to third-party vendors. White Star maintains that operators only have one source of such funds, JIBs from non-operating working interest owners.

Â¶15 White Star next claims that the Legislature's intent to limit the scope of funds subject to statutory trusts under 42 O.S. Â§ 144.2 is evident in certain omissions from its text. Here, White Star compares Â§ 144.2(A) with Â§ 144, which establishes the basis for and scope of oil and gas well liens.[1] Section 144 provides that an oil and gas well lien extends not only to the leasehold and any buildings or appurtenances, but also to the proceeds of any oil and gas produced therefrom. White Star points out that language of Â§ 144.2(A) omits any reference to the proceeds of oil and gas. White Star argues that this omission means the statutory trusts created under Â§ 144.2(A) do not apply to other forms of revenue an operator might take in, such as that from the sale of oil and gas.

Â¶16 Finally, White Star argues that Â§ 144.2 was drafted with the intent to protect non-operating working interest owners from incurring double liability for obligations due to third-party vendors. White Star notes that non-operating working interest owners are not in privity of contract with the vendors. However, in the event a non-operating working interest owner pays its share of the expenses, and the operator fails to pay a vendor, Â§ 144.2 provides protection to the working interest owner because its payments are held in trust for the benefit of the vendor.

Â¶17 In short, White star's proffered interpretation of Â§ 144.2(A) limits the scope of the statute's applicability to obligations owed by an operator to third-party vendors; and it limits the funds which are subject to the statutory trust based on their source, specifically to those received by the operator in the form of JIBs. However, we find no basis for these limitations in the text or purpose of Â§ 144.2(A).

Â¶18 Contrary to White Star's assertions, nothing in the statute purports to limit its applicability to obligations owed by an operator to third-party vendors. In fact, Â§ 144.2(A) extends trust fund protections to all lienable claims arising not only under drilling and reworking contracts, but also under operating agreements and forced pooling orders. In so doing, the statute expressly contemplates a variety of relationships and financial obligations among parties involved in the drilling process, which include not only vendors and operators but also contractors and working interest owners. If it was the intent of the Legislature to limit the scope of Â§ 144.2 to lienable claims due and owing by operators to vendors, the extension of trust fund protections to lienable claims arising under operating agreements and forced pooling orders would make little sense. Neither operating agreements nor forced pooling orders give rise to contractual relationships or lienable claims between operators and vendors.[2] As such, we see no basis for limiting the applicability of Â§ 144.2(A) to obligations between third-party vendors and operators, and the Court will not read limitations into the text of a statute where they are not clearly expressed. See TRW/Reda Pump, 1992 OK 31, Â¶5, 829 P.2d at 20.

Â¶19 Similarly, nothing in the text of Â§ 144.2(A) purports to limit the sources of revenue subject to the statutory trust to JIBs. Rather than referencing specific funds, Â§ 144.2(A) merely states that the "amount payable" shall be held by the operator as trust funds for payment of lienable claims. The omission of any reference to specific funds, in favor of the "amount payable" language, which we take to mean the amount owing, demonstrates that the Legislature was more concerned with securing the full amount of any lienable claims than with securing certain sources of revenue for payment of those claims. Likewise, the "upon receipt" language does not limit the sources of revenue which are subject to the statutory trust. Rather, this language speaks to the priority which the Legislature placed on an operator's obligation under Â§ 144.2(A), which is to say that as funds are received, they should be held in trust for that purpose.

Â¶20 White Star also made several arguments not based in the text to support its claimed limitations on the sources of revenue subject to the statutory trust. We are not willing to ascribe an intent to the Legislature to limit the scope of Â§ 144.2 based on the language in Â§ 144. Furthermore, to the extent that Â§ 144 is relevant to our analysis, it may well support an interpretation contrary to that of White Star. If the proceeds of oil and gas produced from a particular leasehold are subject to a service provider's lien pursuant Â§ 144, we see no reason why those proceeds would be exempt from statutory trust funds created by Â§ 144.2 to secure those liens. Finally, we do not agree that the Legislature's intent in creating the statutory trusts under Â§ 144.2 was to protect non-operating working interest owners from incurring double liability for costs and expenses due to third-party vendors.

Â¶21 The manifest purpose of Â§ 144.2 is to provide a measure of security in the form of trust funds to the designated lienholders against the risk of insolvency or corrupt dealing of operators. This security is afforded to any holder of a lienable claim due and owing by the operator pursuant to a drilling contract, reworking contract, operating agreement, or forced pooling order. In operation, Â§ 144.2 achieves that goal by creating a simple mandate for operators: any amount received, up to the amount of all lienable claims, shall be held in trust for payment of said lienable claims until paid. The statute does not require that these funds be received from any particular source, but it does require that operators make a priority of accumulating and maintaining the funds when they are received. For these reasons, we answer the reformulated first question in the negative. Title 42, Section 144.2 does not limit the types of revenue which must be held in trust for payment of lienable claims.

II. The Oil and Gas Owners' Lien Act does not grant operators and non-operating working interest owners a lien in proceeds from the sale of oil and gas which is prior and superior to any claim of the holder of a mechanic's and materialman's lien.

Â¶22 As to the second question, we answer in the negative as well. The Oil and Gas Owners' Lien Act, 52 O.S. Â§ 549.1 et seq., does not grant operators and non-operating working interest owners a lien in proceeds from the sale of oil and gas which is prior and superior to any claim of the holder of a mechanic's and materialman's lien asserted under 42 O.S. Â§ 144.

Â¶23 Title 52, Section 549.3 states:

A. To secure the obligations of a first purchaser to pay the sales price, each interest owner is hereby granted an oil and gas lien to the extent of the interest owner's interest in oil and gas rights. The oil and gas lien granted by this act is granted and shall exist as part of and incident to the ownership of oil and gas rights.

[...]

C. An oil and gas lien exists until the interest owner or representative first entitled to receive the sales price has received the sales price.

[...]

Â¶24 White Star points to Â§ 549.7, which states, "Except for a permitted lien, an oil and gas lien is a lien that takes priority over any other lien, whether arising by contract, law, equity or otherwise, or any security interest."[3] White Star thus contends that the liens held by it and affiliated non-operating working interest owners are superior to those held by the M&M lien claimants.

Â¶25 White Star's position, however, is inconsistent with both the text and legislative history of the Oil and Gas Owners' Lien Act. As defined in the act, an interest owner is "a person owning an interest of any kind or nature in oil and gas rights before the acquisition thereof by a first purchaser." 52 O.S. Â§ 549.2(6) (emphasis added). Oil and gas rights include, among other things, any right, title, or interest in oil, gas, proceeds from the sale of either, or an oil and gas lease. Id. at Â§ 549.2(9)(a). It also includes a "mortgage lien or security interest in any of the foregoing." Id. at Â§ 549.2(9)(b)(6). Title 42, Section 144 provides vendors, in this case the M&M lien claimants, a lien on the leasehold on which they performed work, as well as the proceeds from the sale of oil and gas therefrom. Thus, the M&M lien claimants are in parity to operators and non-operating working interest owners pursuant to the Oil and Gas Owners' Lien Act, and they are entitled to the same super-priority as White Star and its affiliated non-operating working interest owners.[4]

Â¶26 Additionally, both White Star and the M&M lien claimants note that the Oil and Gas Owners' Lien Act was amended in 2010 in response to a decision out of the United States Bankruptcy Court for the District of Delaware. See In re Semcrude, L.P., 407 B.R. 140 (Bankr. D. Del. 2009); see also Comment 1 to 52 O.S. 549.1. The bankruptcy court in In re Semcrude determined that based on an old version of the act, the claims of working interest owners in Oklahoma on the assets of a defunct first purchaser were subordinate to security interests and liens asserted by the first purchaser's other creditors under the Uniform Commercial Code. Semcrude, 407 B.R. at 156-57.

Â¶27 White Star argues that the Legislature sought to respond to the Semcrude decision by providing traditional interest owners with a security interest in proceeds from the sale of oil and gas that is prior and superior to all other lienholders. This reading, however, demonstrates a misunderstanding of the relationships among the parties in Semcrude and their respective security interests. In that case, the interest owners were seeking to establish priority in relation to the other creditors of a first purchaser. Id. at 140. The present case is distinguishable because White Star, as an interest owner and operator, is seeking to establish priority in relation to its own creditors. Such a result would be plainly absurd. See TRW/Reda Pump, 1992 OK 31, Â¶5, 829 P.2d at 20. The 2010 amendments to the Oil and Gas Owners' Lien Act were clearly intended to ensure that interest owners received payment from first purchasers of oil and gas. The 2010 amendments were not intended to insulate traditional interest owners from liabilities they incurred in the operation of their well sites.

CONCLUSION

Â¶28 In answer to the first question of law certified to this Court by the Bankruptcy Court, we find that the funds which must be held in trust for payment of lienable claims pursuant to 42 O.S. Â§ 144.2 are not exclusively limited to joint-interest billing payments received by operators for services rendered by the lienholders. In answer to the second question, we find that the Oil and Gas Owners' Lien Act, 52 O.S. Â§ 549.1 et seq., does not grant operators and non-operating working interest owners a lien in proceeds from the sale of oil and gas which is prior and superior to any claim of the holder of a mechanic's and materialman's lien asserted under 42 O.S. Â§ 144.

CERTIFIED QUESTIONS ANSWERED

ALL JUSTICES CONCUR

FOOTNOTES

[1] Title 42, Section 144 provides:

Any person, corporation, or copartnership who shall, under contract, expressed or implied, with the owner of any leasehold for oil and gas purposes, or the owner of any gas pipeline or oil pipeline, or with the trustee or agent of such owner, perform labor or services, including written contracts for the services of a geologist or petroleum engineer, or furnish material, machinery, and oil well supplies used in the digging, drilling, torpedoing, completing, operating, or repairing of any oil or gas well, or who shall furnish any oil or gas well supplies, or perform any labor in constructing or putting together any of the machinery used in drilling, torpedoing, operating, completing, or repairing of any gas well, or perform any labor upon any oil well supplies, tools, and other articles used in digging, drilling, torpedoing, operating, completing, or repairing any oil or gas well, shall have a lien upon the whole of such leasehold or oil pipeline, or gas pipeline, or lease for oil and gas purposes, the buildings and appurtenances, the proceeds from the sale of oil or gas produced therefrom inuring to the working interest, exempting, however, any valid, bona fide reservations of oil or gas payments or overriding royalty interests executed in good faith and payable out of such working interest, and upon the material and supplies so furnished, and upon any oil well supplies, tools, and other articles used in digging, drilling, torpedoing, operating, completing, or repairing any oil or gas well, and upon the oil or gas well for which they were furnished, and upon all the other oil or gas well fixtures and appliances used in the operating for oil and gas purposes upon the leasehold for which said material and supplies were furnished or labor or services performed. Such lien shall be preferred to all other liens or encumbrances which may attach to or upon said leasehold for gas and oil purposes and upon any oil or gas pipeline, or such oil and gas wells and the material and machinery so furnished and the leasehold for oil and gas purposes and the fixtures and appliances thereon subsequent to the commencement of or the furnishing or putting up of any such machinery or supplies; and such lien shall follow said property and each and every part thereof, and be enforceable against the said property wherever the same may be found; and compliance with the provisions of this article shall constitute constructive notice of the lien claimant's lien to all purchasers and encumbrancers of said property or any part thereof, subsequent to the date of the furnishing of the first item of material or the date of the performance of the first labor or services.

[2] Although primarily relevant to the second certified question, the comments to 52 O.S. Â§ 549.1 provide a helpful overview of the oil and gas industry, particularly as it is understood by the Legislature. The comments also explain, at least in part, the nature of joint operating agreements and forced pooling orders. Comment 8 explains that joint operating agreements "typically set the terms by which the operator or working interest owner is given the authority to sell the oil and gas product on behalf of those with an interest in the product, including the royalty share." Comment 5 states, "Under a forced pooling order, an unleased interest owner [...] is afforded the opportunity to participate in the development of the minerals; in the absence of an election to participate, those rights are transferred by operation of the pooling order to the operator of the unit."

While the full extent of the relationships and obligations created by joint operating agreements and forced pooling orders are not explained by these comments, it seems clear that neither joint operating agreements nor forced pooling orders exclusively, or even primarily, give rise to relationships between operators and third-party vendors.

[3] To clarify, an "oil and gas lien," as used here, refers to a lien granted by the Oil and Gas Owners' Lien Act, 52 O.S. Â§ 549.1 et seq., as opposed to the oil and gas well lien granted to vendors under 42 O.S. Â§ 144.

Additionally, a "permitted lien" generally refers to:

a. a mortgage lien or security interest granted by a first purchaser in favor of a person not an affiliate of the first purchaser which mortgage lien or security interest secures payment under a written instrument of indebtedness signed by the first purchaser and accepted in writing by the payee thereof prior to the effective date of this act with a principal amount and a fixed maturity stated therein; [..., or]

b. a validly perfected and enforceable lien created by statute or by rule or regulation of a governmental agency for storage or transportation charges, including terminal charges, tariffs, demurrage, insurance, labor or other charges, owed by a first purchaser in relation to oil or gas originally purchased under an agreement to sell [...]

52 O.S. Â§ 549.2(11).

[4] Although the definition of "interest owner" set out in 52 O.S. Â§ 549.2(6) may include royalty owners, the scope of the question presented to this Court does not contemplate royalty owners, and thus, our findings are limited to the priority of operators and non-operating working interest owners in relation to M&M lien claimants.